[Cite as *State v. Keck*, 2011-Ohio-1643.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

STATE OF OHIO,                           :

    Plaintiff-Appellee,                 :           Case No.   09CA50

    vs.                                 :

DANIEL ARDEN KECK, II,                   :           DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.                :

_____

APPEARANCES:

COUNSEL FOR APPELLANT:        Charles H. Rittgers and Nicholas D. Graman, Rittgers &
                              Rittgers, 12 East Warren Street, Lebanon, Ohio 45036[1]

COUNSEL FOR APPELLEE:         James E. Schneider, Washington County Prosecuting
                              Attorney, and Alison L. Cauthorn, Washington County
                              Assistant Prosecuting Attorney, 205 Putnam Street,
                              Marietta, Ohio 45750

CRIMINAL APPEAL FROM COMMON PLEAS
DATE JOURNALIZED: 3-30-11

ABELE, J.

{¶ 1}   This is an appeal from multiple Washington County Common Pleas Court

judgments of conviction and sentence.   A jury found Daniel Arden Keck, II, defendant below

and appellant herein, guilty of (1) six counts of the illegal use of a minor in nudity oriented

materials in violation of R.C. 2907.323(A)(3); (2) five counts of the illegal use of a minor in

---

[1] Different counsel represented appellant during the trial court proceedings.

nudity oriented materials in violation of R.C. 2907.323(A)(1); (3) five counts of gross sexual

imposition in violation of R.C. 2907.05(A)(4)&(C) (2); (4) five counts of pandering sexual

matter involving a minor in violation of R.C. 2907.322(A)(5); (5) four counts of rape in violation

of R.C. 2907.02(A)(1)(b); (6) two counts of kidnapping in violation of R.C. 2905.01(A)(2); (7)

one count of pandering obscenity in violation of R.C. 2907.321(A)(5); and (8) one count of

pandering obscenity in violation of R.C. 2907.321 (A)(1).

{¶ 2}    Appellant assigns the following errors for review[2]:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED TO THE PREJUDICE OF
DEFENDANT WHEN IT DENIED HIM HIS RIGHT TO
CONFRONTATION AND PERMITTED HEARSAY
TESTIMONY REGARDING LABORATORY ANALYSES[.]"

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT IMPOSED A
CONSECUTIVE SENTENCE ON APPELLANT THAT IS
CONTRARY TO LAW[.]"

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT VIOLATED
APPELLANT'S RIGHTS UNDER THE EXCESSIVE FINES
CLAUSES OF THE EIGHTH AMENDMENT OF THE UNITED
STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF
THE OHIO CONSTITUTION[.]"

FOURTH ASSIGNMENT OF ERROR:
"THE JURY ERRED WHEN IT ENTERED A JUDGMENT
AGAINST THE APPELLANT WHICH WAS NOT SUPPORTED
BY SUFFICIENT EVIDENCE TO FIND HIM GUILTY[.]"

---

[2] Appellant's brief does not set out a separate statement of the assignments of error.    See App.R. 16(A)(3).    Thus, we take the assignments of error from the brief's table of contents.

FIFTH ASSIGNMENT OF ERROR:

"THE JURY ERRED WHEN IT ENTERED A JUDGMENT AGAINST THE APPELLANT WAS WAS [sic] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL[.]"

SIXTH ASSIGNMENT OF ERROR:

"APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN THAT COUNSEL'S REPRESENTATION WAS PROFESSIONALLY UNREASONABLE, IS [sic] PREJUDICIAL TO DEFENDANT AND FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS[.]"

**{¶ 3}** After appellant received his mechanical engineering degree, he accepted a position with American Electric Power (AEP) in Washington County. In 1993, a member of his church asked him to become involved in an organization called the "Royal Rangers." This organization was described as a "Christian" equivalent of the Boy Scouts. Consequently, appellant came into contact with a number of teen and pre-teen boys whom he tried to "mentor." This led to contact with a number of other boys, many from disadvantaged economic backgrounds and some without a significant "father figure."

**{¶ 4}** In January 2009, one of those boys (J.D.) confided to his mother that appellant had engaged him in anal sex. The mother contacted authorities and met with Marietta Police Department Detective Troy Hawkins. Hawkins attempted to arrange several "controlled" calls between J.D. and appellant, but when the calls were not answered, he obtained a search warrant.

**{¶ 5}** Authorities executed the warrant on January 9, 2009. At that time, two other young boys (G.L. and A.M.) were on the premises. The officers separated appellant from the

boys and G.L. stated that he had been subject to some of the same abuse that J.D. had reported. The search of appellant's home and computer also yielded videos and computer images of underage nude boys, either by themselves or engaged in some form of sexual activity.

{¶ 6}   In 2009, the Washington County Grand Jury returned three separate indictments that charged appellant with a total of fifty-four counts that involved various degrees of sexual misconduct and related offenses with underage boys.   Many of the charges carried forfeiture specifications that alleged that appellant used certain chattel and real property in the commission of the offenses.   Appellant pled not guilty to all charges and the matter came on for jury trial in August and September 2009.

{¶ 7}   At trial, several boys testified that they slept at appellant's home only to awake the next morning to find "Vaseline" or another sticky substance around their legs or buttocks area. One boy, (A.B.) stated that he awoke one night to find appellant in bed behind him, "humping" him between the legs.   Another boy (G.L.) gave a similar account.

{¶ 8}   Most of the evidence indicated that the sexual activity took place in appellant's Washington County home.   Testimony revealed that appellant invented various sexual games such as "Flash" tag (appellant would pursue a naked boy through the house trying to photograph him) or "Raper Scaper" (the participants played tag, but rather than actually "tagging" the other participants, they ran around naked and tried to "hump" against them).   A few boys testified that appellant took them out of Washington County to other parts of Ohio and engaged in sexual activity.   J.D., in particular, related that appellant even took him to Honduras where they

engaged in sexual activity.[3]

{¶ 9}  Federal Bureau of Investigation Special Agent David Barnes also testified concerning his forensic examination of the appellant's computer.   Detective Hawkins identified a number of pictures recovered from that computer as some of the children that appellant was alleged to have molested.   Several Ohio Bureau of Criminal Investigation (BCI) agents also related how various chemical tests linked some of the victims' DNA to appellant's DNA.

{¶ 10}  At the conclusion of the prosecution's case, the defense requested a Crim.R. 29 judgment of acquittal.   The trial court granted the motion with respect to three counts, but allowed the remaining counts to proceed.   Also, one count was amended from a charge of rape to gross sexual imposition.

{¶ 11}  The defense then presented a compelling case.   Appellant's mother and sister both testified that they were around some of these children on various occasions (family reunions or trips to a family farm around Sandusky) and did not observe anything suspicious or out of the ordinary in how the children related to appellant.   Several neighbors also testified that they observed nothing untoward in appellant's behavior toward the children.   Angie Scott, in particular, testified that her youngest son spent a lot of time with appellant.   So too did the son of Nancy Harris, and Harris testified that she trusted appellant even after his arrest and would continue to allow her son to spend time with him.

{¶ 12}  One alleged victim (D.H.) testified that appellant did not molest him, but the police nevertheless forced him to accuse appellant.   Also, other evidence was adduced that the

---

[3] Appellant explained that shortly before his uncle's death, his uncle transferred to him a beach front property in Honduras.

anticipation of monetary gain from appellant may have motivated some of the accusations.   D.L. (D.H.'s father and the uncle of A.L.) testified that he did not believe his son's earlier accusation against appellant and that his nephew (A.L.) had confided to him that "he had every intention[] of getting all he could out of [appellant]."

{¶ 13} After hearing all the evidence and counsels' arguments, the jury found appellant guilty on twenty-nine counts.   Of those, the trial court found two to be "allied offenses" of two other counts and thus merged those offenses.   On six other counts, the jury returned "not guilty" verdicts.[4]

{¶ 14} In October 2009, the trial court considered the prosecution's request for the forfeiture of property, appellant's sex offender status and sentencing.   The trial court ordered forfeiture of appellant's computer, a digital camera and his Washington County residence (valued at $89,090).   The court found that the residence was an integral part of appellant luring his victims and it was appropriate for forfeiture.   The court also adjudicated appellant as a Tier III sex offender.   The court then proceeded to sentencing.   Individual terms of imprisonment are not at issue in this appeal, although the decision to require many sentences to be served consecutively is raised for review.   Thus, we will not repeat the sentences imposed for each individual count.   However, the total of prison sentences resulted in a "definite period of seventy-one (71) years" imprisonment.   This appeal followed.

I

{¶ 15} Appellant's first assignment of error involves DNA evidence.   Six people

---

[4] Shortly before the trial, the trial court dismissed thirteen of the counts from one case as having been superceded by counts from a later indictment.

(appellant and five alleged victims) submitted DNA swabs to compare with DNA found at appellant's home.[5]   BCI Agent Mark Losko took those swabs, and Agent Kristen Slaper then compared DNA profiles to DNA evidence recovered from appellant's home.   Although Slaper testified at trial, Losko did not.   Because Losko did not testify, defense counsel could not cross-examine him.   Appellant thus asserts that he was denied his rights under the United States Constitution to confront adverse witnesses against him.

{¶ 16}   The Sixth Amendment to the United States Constitution guarantees that a criminal defendant has the right to be "confronted" by the witnesses against him." This guarantee is applicable to the states through the Fourteenth Amendment Due Process Clause, Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).   Section 10, Article I, Ohio Constitution also provides the same protection.   Implicit in these guarantees is the right to cross-examine adverse witnesses. State v. Williams (1983), 4 Ohio St.3d 74, 75, 446 N.E.2d 779; State v. Miller (1975), 42 Ohio St.2d 102, 104, 326 N.E.2d 259.

{¶ 17}   In Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 354, 158 L.Ed.2d 177, the United States Supreme Court held that "testimonial statements" of witnesses who are absent from trial may be admitted into evidence only if a declarant is unavailable, and only when the defendant had a prior opportunity to cross-examine that declarant. Id. at 54-56.   As we noted in State v. Jones, Gallia App. No. 09CA1, 2010-Ohio-865, at ¶23, Crawford failed to provide a clear definition for what constitutes a "testimonial statement."   The Untied States Supreme

---

[5]   Most of the DNA evidence taken from the home came from a bedroom with a waterbed.     Several victims claimed that they were molested in this room.     Jonathan Jenkins, a special agent with BCI, stated that it was "alarming" how much semen he found on the floor and bedding when he examined the room with a black light.

Court did state that it is in the nature of a solemn declaration or affirmation made to establish or prove a fact, such as ex parte in court testimony, affidavits, custodial examinations, depositions, confessions or statements made under circumstances that would lead a witness to reasonably believe the statement would be available for use at a later trial. 541 U.S. at 51-52.

{¶ 18} Recently, the United States Supreme Court applied Crawford in the context of chemical analyses. In Melendez-Diaz v. Massachusetts (2009), ___ U.S. ___, 129 S.Ct. 2527, 174 L.Ed.2d 314, police found in a vehicle a white substance, later confirmed to be cocaine. The chemist who performed those tests did not testify at trial, but instead submitted "certificates of analysis" that outlined his forensic study of the evidence. Justice Scalia, writing for a plurality, opined that the certificates are, quite plainly, affidavits. Accordingly, "there is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements'" described in Crawford. Id. at 2532.[6]

{¶ 19} On the basis of Melendez-Diaz, the United States Supreme Court vacated, but did not reverse, the Ohio Supreme Court in State v. Crager, 116 Ohio St.3d 369, 879 N.E.2d 745, 2007-Ohio-6840. Crager allowed a BCI agent to testify concerning a DNA analysis performed by another agent. See Crager v. Ohio (2009), ___U.S. ___, 129 S.Ct. 2856, 174 L.Ed.2d 598. The United States Supreme Court ordered that Crager be reconsidered in light of Melendez-Diaz.[7]

---

[6] Justice Thomas, who provided the fifth vote in the case, wrote that he joined the plurality because the certificates are quite plainly affidavits. He further explained that he continued to adhere to the position that the Confrontation Clause is only implicated by "extrajudicial statements" only insofar as they are contained in formalized materials, like "affidavits, depositions, prior testimony, or confessions." Id. at 2543 (Thomas, J. Concurring)(Citations omitted).

[7] To date, the resolution of this issue is unclear. The Ohio Supreme Court responded to the Supreme Court

{¶ 20} More specifically, in Crager the BCI agent who performed DNA tests on materials that linked the suspect to a murder victim was on maternity leave at the time of trial. Another BCI agent testified in her place and explained the processes by which the DNA tests are conducted, as well as BCI's accreditation and quality control. He then recounted "his technical review of [the testing agent's] work" as well as "her notes, the DNA profiles she generated, her conclusions, and the final report[.]" He concluded that "the decisions or conclusions that [the testing agent] came up with were consistent and were supported by her work that she did." 2007-Ohio-6840, at ¶¶8-18. The Ohio Supreme Court held that the DNA report is a non-testimonial business record, and, thus, its introduction without testimony of the BCI agent who prepared it did not constitute a Confrontation Clause violation. Id. at ¶¶50-51; also see State v. Craig, 110 Ohio St.3d 306, 853 N.E.2d 621, 2006-Ohio-4571, ¶¶ 82-83 & 88.

{¶ 21} The gist of appellant's argument in his first assignment of error is that the introduction of DNA evidence, in the absence of Agent Losko's testimony, violates appellant's confrontation rights under the Sixth Amendment. He concludes that the United States Supreme Court decisions in Crawford, Melendez-Diaz and Crager all mandate the reversal of his conviction in the case sub judice.

{¶ 22} To begin, we note that the United States Supreme Court did not reverse the Ohio Supreme Court's ruling in Crager. Rather, it vacated the judgment and remanded the case for

---

mandate by vacating the trial court's judgment and remanding the case to the Marion County Court of Common Pleas to consider the matter in light of Melendez-Diaz. See State v. Crager, 123 Ohio St.3d 1210, 914 N.E.2d 1055, 2009-Ohio-4760. Except for an entry that denied a motion for reconsideration of that order, see State v. Crager, 124 Ohio St.3d 1446, 920 N.E.2d 375, 2010-Ohio-188, there is nothing to indicate any further activity.

reconsideration in light of Melendez-Diaz.   Lower courts may, and occasionally do, come to the same conclusion they previously reached after a remand by the United States Supreme Court to reconsider a case in light of new law.[8]

{¶ 23} We also point out that Agent Losko's analysis of the known samples was not introduced into evidence.   It is true that Agent Slaper referenced them in explaining her own analysis and report, but this is different than the issue in Melendez-Diaz in which a certificate (or affidavit) was introduced without any supporting testimony, subject to cross-examination, by the person who prepared it.   In footnote six, Justice Thomas provided the requisite final vote to reach a plurality in Melendez-Diaz and he is clear that he did so only because the evidence in that case was a "formalized material[]" like an affidavit, deposition or recorded confession.   Thus, had Justice Thomas been confronted with a case such as the one sub judice, he may well have ruled otherwise.

{¶ 24} Furthermore, an even more significant factor leads us to conclude that this case is distinguishable from Melendez-Diaz and Crager.   Here, Kristen Slaper performed the DNA tests that matched cells from the bedroom to the known samples that Agent Losko analyzed.   Slaper then testified at trial concerning her findings.   In contrast, no person involved in the chemical analysis in either Melendez-Diaz or Crager appeared in court to testify and subject themselves to

_____

[8] See, e.g., Equality Foundation of Greater Cincinnati, Inc. v. Cincinnati (C.A.6 1997), 128 F.3d 289, which upheld a Cincinnati charter amendment removing gays and lesbians as a class for whom anti-discrimination ordinances could be passed by city council.    The Sixth Circuit came to the same conclusion two years earlier in Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati (C.A.6 1995) 54 F.3d 261.    However, that decision was vacated by the United States Supreme Court in 1996, see 518 U.S. 1001, 116 S.Ct. 2519, 135 L.Ed.2d 1044, and the Sixth Circuit was ordered to reconsider its ruling in light of Romer v. Evans (1996), 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855.    In the 1997 case, the Sixth Circuit believed that the factual circumstances in Ohio were sufficiently different from those in Colorado and, thus, the Supreme Court's ruling did not mandate a conclusion different from the one they had previously reached.

cross-examination.   We believe that factor is very significant.

**{¶ 25}** First, Slaper's analysis provided the nexus between the accused and the crimes. Slaper, not Losko, tested the semen and other samples found on the bedding and, in at least one instance, found a sperm cell from appellant in the same location as a non-sperm cell from J.D., thus corroborating J.D.'s claim that appellant raped him.   This is the sort of evidence that incriminated appellant.   Once again, Slaper testified at trial and was thoroughly cross-examined. This was not the case in Melendez-Diaz or Crager.

**{¶ 26}** Second, Slaper testified that "with the exception of identical twins, no two people share the same DNA."   That DNA is unique to each individual, other than identical twins, is also accepted in federal courts.   See e.g. Kaemmerling v. Lappin (C.A. D.C. 2008), 553 F.3d 669, 681; Banks v. United States (C.A.10 2007), 490 F.3d 1178, 1180; Jones v. Murray (C.A.4 1992), 962 F.2d 302, 307.   This is what makes DNA evidence useful.   Thus, if Losko erred in analyzing the known samples of DNA in the case sub judice, then Slaper would have had to commit the same error in order to make a match.   If that were the case, Slaper testified at trial and was available for cross-examination.   Again, our review of the trial transcript reveals that defense counsel thoroughly cross-examined Slaper.

**{¶ 27}** Although our research has yielded no authority precisely on point with the particular facts and circumstances of this case, we have located cases to support our view that Melendez-Diaz does not require the reversal of appellant's conviction.   In an unreported decision, a California federal district court held that Melendez-Diaz does not prevent one expert from testifying on the   chemical reports prepared by another deceased expert from the same office.   See Scott v. Mule Creek State Prison (May 11, 2010), CD California 07-909- SVW.   An

earlier case from that same district found that nothing in Melendez-Diaz prohibited one lab analyst from basing an opinion on work done by another analyst who did not appear at trial.   See Larkin v. Yates (Jul. 9, 2009), C.D. California 09-2034-DSF.   In Hamilton v. Texas (S.A. App. 2009), 300 S.W.3d 14, 21-22, an appellate court found no Melendez-Diaz violation when a lab analyst testified to a defendant's DNA profile prepared by another lab analyst who no longer worked for the state and was not available for trial.

{¶ 28}  We are cognizant that during Slaper's testimony, she explained that Losko took the samples, ran them "through a series of scientific steps and a profile, a piece of paper readout, printout" was generated at the end.   Losko did no actual "analysis" himself, Slaper explained; rather, "he just simply prints it out and hands it to the casework analyst."   To that end, we note that the federal Fourth Circuit Court of Appeals has found no Confrontation Clause violation when raw data generated from a machine is introduced into evidence at trial even though the technician who operated that machine is not in court to testify. United States v. Washington (C.A.4 2007), 498 F.3d 225, 229.

{¶ 29}  We find the analysis in the cases cited above persuasive, and also reinforce our belief that Melendez-Diaz is distinguishable   and that appellant's confrontation rights were not violated by allowing Slaper to give an expert opinion based, in part, on earlier DNA profiles that Losko had given to her.   Slaper established a nexus between appellant and the incriminating DNA evidence taken from bedding.   Slaper appeared at trial and was subjected to defense counsel's thorough cross-examination.

{¶ 30}  Consequently, based upon the foregoing reasons, we find that no violation of appellant's Sixth Amendment Confrontation rights occurred.   Accordingly, we hereby overrule

appellant's assignment of error.

II

**{¶ 31}** In his second assignment of error, appellant asserts that the trial court erred by ordering many of his sentences to be served consecutively to one another.

**{¶ 32}** In State v. Foster, 109 Ohio St.3d 1, 845 N.E.2d 470, 2006- Ohio-856, the Ohio Supreme Court struck down as unconstitutional a number of Ohio's felony sentencing statutes. Some of those statutes required trial courts to engage in judicial fact-finding before they could impose consecutive sentences. Id. at paragraph three of the syllabus.   After Foster, Ohio courts are no longer required to make findings or to provide reasons for imposing consecutive sentences. Id. at paragraph seven of the syllabus.

**{¶ 33}** Appellant argues that the United States Supreme Court "overruled" Foster in Oregon v. Ice (2009), ___ U.S. ___, 129 S.Ct. 711, 172 L.Ed.2d 517, and, as a result, "Ohio trial courts must return to the felony sentencing scheme that existed prior to Foster[.]" We disagree with this view.   As our Fifth District colleagues have aptly noted, until the Ohio Supreme Court decides the effect of Ice on Foster, intermediate appellate courts are bound by Foster.   See State v. Lenoir, Delaware App. No. No. 10CA10011, 2010-Ohio-4910, at ¶59.

**{¶ 34}** Appellant's better argument is that the trial court failed to comply with the new version of R.C. 2929.14(E)(4) as amended, effective April 7, 2009, by H.B. 130.   Here again, however, appellant's argument must fail.   Although H.B. 130 contains provisions similar to R.C. 2929.14(E)(4), as struck down by Foster, the Fifth District Court of Appeals examined H.B. 130 and concluded that the Ohio General Assembly did not intend to re-enact those provisions that were struck down as unconstitutional.   Their conclusion is based on the fact that the House Bill

set out the statutory subsection in regular typeface without any indication that the legislation

added new material to the statute. See <u>Lenoir</u>, supra at ¶¶57-60; <u>State v. Arnold</u>, Muskingum

App. No. CT2009-0021, 2010-Ohio-3125, at ¶16.   This also appears to be the conclusion of the

Eighth District Court of Appeals.   See <u>State v. Worthy</u>, Cuyahoga App. No. 94565,

2010-Ohio-6168, ¶¶10-12.

**{¶ 35}** Moreover, insofar as appellant's argument is grounded in the contention that the

trial court made no findings for consecutive sentences, we simply disagree.   Here, the trial court

cited a number of reasons for its decision including, inter alia: (1) appellant's failure to show

remorse as to any of the offenses, except for one video that he filmed; (2) the age of the victims;

(3) the fact that the victims were not developed emotionally or sexually; (4) the victims suffered

serious psychological harm; (5) the sheer number of offenses, and duration of his actions over a

number of years, rendered him non-amenable for community control; (6) that his actions

suggested organized criminal activity – presumably referring to his access to pedophile websites

like the one based in the Russian Federation; and (7) that the prison sentences are consistent with

the purposes of R.C. 2929.11.

**{¶ 36}** For all these reasons, we find no merit in appellant's second assignment of error

and it is hereby overruled.

III

**{¶ 37}** Appellant's third assignment of error involves the forfeiture of his property.

Appellant argues that the forfeiture of his home is grossly disproportionate to the magnitude of

the crimes and constitutes an "excessive fine" in violation of both the Ohio and United States

Constitutions.    We disagree.[9]

{¶ 38}  The Eighth Amendment to the United States Constitution and Article I, Section 9,

Ohio Constitution contain identical language and prohibit the imposition of "excessive fines."

See State v. French, Lucas App. No. L-09-1087, 2010-Ohio-6517, at ¶18; State v. Dolman,

Williams App. No. WM-10- 007, 2010-Ohio-5505, at ¶41.   Although reviewing courts defer to a

trial court's factual findings on forfeiture, we apply a de novo standard of review when we

consider whether the forfeiture violates either the federal or state constitutions.   See State v.

Kish, Lorain App. No. 02CA008146, 2003-Ohio-2426, at ¶55.

{¶ 39}  The Ohio Supreme Court has not provided detailed interpretation of this provision

of Ohio's Constitution.   The court has, however, stated that "trial court[s] must make an

independent determination" of whether forfeiture of property is an excessive fine prohibited by

both Constitutions.   State v. Hill (1994), 70 Ohio St.3d 25, 34, 635 N.E.2d 1248.   After having

set forth that principle, the Ohio Supreme Court has not, however, delineated a standard that

courts may use to order or to review forfeitures.

{¶ 40}  Federal courts have also been rather vague on this topic.   The touchstone of

constitutional inquiry under the Eighth Amendment's Excessive Fines Clause is the principle of

"proportionality." United States v. Bajakajian (1998), 524 U.S. 321, 335, 118 S.Ct. 2028, 141

L.Ed.2d 314.   "If the amount of the forfeiture is grossly disproportional to the gravity of the

defendant's offense, it is unconstitutional." Id. at 337.   Although the Court did not set out a

particular test to determine "gross disproportionality," other federal courts have looked, inter alia,

---

[9]  Although appellant's argument sets out forfeiture provisions in R.C. Chapter 2981, most of his argument and the text of the assignment of error are confined to Constitutional issues.     We do the same with our analysis.

to fines or other financial penalties that a legislature authorized and the degree of harm that a defendant caused.   See e.g. United States v. Levesque (C.A.1 2008), 546 F.3d 78, 82-84.

{¶ 41} As a result, many jurisdictions have based proportionality reviews on the comparison between the value of property forfeited and the maximum allowable fine.   See e.g. United States v. Yu Tian Li (C.A.7 2010), 615 F.3d 752, 757 (forfeiture of a $179,200 home is not disproportionate to crime for which the maximum penalty was $250,000); United States v. Hull (C.A.8 2010), 606 F.3d 524, 530 (forfeiture of $192,632 in equity in a home is not disproportionate when maximum fine could have been $200,000); Commonwealth v. 542 Ontario Street (Pa.Cmwlth. 2010), 989 A.2d 411, 419 (forfeiture of a $65,000 house is not grossly disproportionate compared to a maximum possible penalty of $100,000); Hill v. Commonwealth (Ky.App. 2010), 308 S.W.3d 227, 231 (forfeiture of $2,175 in cash is not disproportionate when the maximum allowable fine is $10,000).

{¶ 42} In the case sub judice, the record indicates that appellant's home had a value of $89,090.   The appellee argues in its brief that the trial court could have imposed fines that far exceed the value of appellant's residence.   The Ohio Revised Code provides that a trial court may impose fines up to $20,000 for every first degree felony.   See R.C. 2929.18(A)(3)(a). Here, appellant was convicted of six (four counts of rape and two counts of kidnapping) first degree felonies.   This alone would have arguably permitted the trial court to impose a $120,000 fine.[10]

---

[10]   By the appellee's calculation, all of the felony convictions would have allowed the trial court to impose $285,000 in fines.    Because the allowable fines on the first degree felonies alone exceed the value of appellant's residence, we need not, and do not, engage in further analysis.

{¶ 43} Moreover, during the sentencing and forfeiture hearing the trial court stated that "no fine is imposed" and explained that its decision is based on the fact that it had already ordered the forfeiture of appellant's home.  In view of the foregoing, we cannot conclude that the forfeiture of appellant's house is "grossly disproportionate."

{¶ 44} Of course, the proportionality of property value to potential fines is not the only factor that the trial court cited in its decision.  First, was the harm caused to the victims who will live with the ramifications of appellant's actions.  Second, the number of the offenses elevates the gravity of this case.  Third, appellant's home was used to lure young victims.  Finally, as was noted during the forfeiture hearing, this case also had a detrimental impact on the community that had to invest considerable resources to both investigate and prosecute these offenses, as well as counsel the victims.

{¶ 45} In summary, in view of the fact that the trial court did not impose fines, and because the value of forfeited property falls far below the amount that appellant could have been fined, we do not believe that the forfeiture of appellant's Washington County residence is grossly disproportionate to his offenses.  Accordingly, we hereby overrule appellant's third assignment of error.

IV

{¶ 46} In his fourth assignment of error, appellant asserts that insufficient evidence was adduced to support his kidnaping convictions.  We disagree.[11]

---

[11] Appellant's brief sets out a combined argument for this and his fifth assignment of error.   The Ohio Rules of Appellate Procedure requires that each assignment of error must have its own argument. App.R. 16(A)(7).    Appellate courts have the option of combining several assignments of error for review in their opinions, but litigants do not. See Ironton v. Rist, Lawrence App. No. 10CA10, 2010-Ohio-5292, at ¶10; Keffer v. Cent. Mut. Ins. Co., Vinton App. No. 06CA652, 2007-Ohio-3984,

{¶ 47} When reviewing the sufficiency of evidence, appellate courts look to the adequacy of evidence and whether that evidence, if believed by the trier of fact, supports a finding of guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541; State v. Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492. In other words, after viewing the evidence, and each inference that can reasonably drawn therefrom, in a light most favorable to the prosecution, could any rational trier of fact have found all essential elements of the offense beyond a reasonable doubt? See State v. Were, 118 Ohio St.3d 448, 890 N.E.2d 263, 2008-Ohio-2762; at ¶132; State v. Hancock, 108 Ohio St.3d 57, 840 N.E.2d 1032, 2006-Ohio-160, at ¶34; State v. Jones (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300.

{¶ 48} Ohio law prohibits someone from taking a child under the age of thirteen from his home to "facilitate the commission of [a] felony." R.C. 2905.01(A)(2). The felony in the case sub judice is rape. J.D. testified that appellant had anal intercourse with him during (1) a trip to appellant's Morrow County cabin[12], and (2) a trip to appellant's Honduras home.[13] Appellant's argument appears to be that no evidence was adduced to prove that he took J.D. on those trips with the specific purpose of engaging in sexual activity with him. However, in view of the evidence introduced to show appellant's sexual attraction toward children, together with the child

---

at ¶8, fn. 2.    Although it would be within our App.R. 12(A)(2) authority to simply disregard appellant's fourth and fifth assignments of error, in the interests of justice we will consider them on the merits.

[12] Although the evidence is somewhat unclear on this point, the record suggests that appellant and his parents paid for this property and that he considers his parents part-owners.    The title, however, is apparently in appellant's name only.

[13] The incident in Morrow County apparently took place in June 2006.    The Honduras trip occurred in December 2006.    Carol Kidd testified that J.D.'s date of birth is March 16, 1994.    Thus, the child was twelve years old at the time of the incidents.

pornography on his computer, we readily conclude that the evidence adduced at trial is more than

sufficient for the jury to conclude that appellant took the child on these trips with the purpose to

commit the felony of rape.

{¶ 49} Appellant counters that in view of all the other evidence of sexual activity at his

Washington County home, why would he need to take the child to another location to engage in

anal intercourse?   He concludes "[i]t makes no sense."   Again, we disagree.   Appellant denied

having committed these acts and denied having any sexual interest in his own gender, and further

asserted he had a romantic interest in a woman with whom he was acquainted.   The appellee's

theory of the case is that appellant is attracted to young boys.   Here, the trial court could

reasonably determine that appellant intended to engage in sexual activity at other locations.

{¶ 50} Appellant also argues it is "telling" the State indicted him for violating subsection

(A)(2) of the kidnaping statute rather than subsection (A)(4).   We do not see the same

significance.   R.C. 2905.01(A)(4) proscribes taking a child under thirteen years of age

somewhere to specifically engage in sexual activity with the child "against the [child's] will."

We found no evidence to indicate that the sexual activity was against J.D.'s will.   To the

contrary, the boy was apparently asleep for most of it.   This is not to suggest, of course, that J.D.

consented to the activity.   Indeed, at twelve years old he was legally incapable of giving consent.

 Still, there is no evidence of force or resistance to support a R.C. 2905.01(A)(4) kidnapping

charge.

{¶ 51} This conclusion is supported by the testimony from Dr. Robin Tener, a clinical

psychologist, called by the appellee as an expert witness.   Dr. Tener testified at length as to the

process called "grooming" whereby an adult sex offender will engage in a form of courtship that

prepares a child for sexual interaction in such a way as to make it seem normal or less threatening. Here, J.D. testified that appellant gave him presents, paid for his "Roomscape" account on the internet and provided him access to pornography. J.D. also testified about having sexual interaction with other boys at appellant's home. All of this, according to the testimony of Dr. Tener, would have prepared J.D. to accept the concept that sex with appellant was normal and, thus, the activity would not have been against the child's will. Indeed, if appellant was inclined to simply force himself on the victims against their will, it would have made little sense for him to engage in the elaborate grooming process as described by Dr. Tener.

{¶ 52} Accordingly, after our review of the evidence in a light most favorable to the prosecution, we conclude that sufficient evidence exists for the jury to find appellant guilty on two charges of kidnapping in violation of R.C. 2905.01(A)(2). Thus, we hereby overrule appellant's fourth assignment of error.

V

{¶ 53} Appellant's fifth assignment of error involves his two kidnapping convictions wherein he argues the jury verdicts are against the manifest weight of evidence. Appellant, however, is not particularly clear as to why he believes this is the case and seems to make this argument for the sole reason that it is "interrelated" with his sufficiency of the evidence argument.[14]

{¶ 54} Furthermore, we assume that the gist of appellant's argument is that the jury

---

[14] Although arguably "interrelated," a "sufficiency of the evidence" argument is separate and distinct from a "manifest weight of the evidence" argument. See State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541; also see State v. Umphries, Ross App. No. 09CA3114, 2010-Ohio-866, at ¶7.

should have believed his denials and his claim that he has no sexual interests in children that would have prompted him to take the boy to Honduras or Morrow County for such purposes. For the following reasons, however, we reject this argument.

**{¶ 55}** Reviewing courts will not reverse a conviction on manifest weight of the evidence grounds unless it is obvious that the jury clearly lost its way and created such a manifest miscarriage of justice that reversal and a new trial are required. State v. Earle (1997), 120 Ohio App.3d 457, 473, 698 N.E.2d 440; State v. Garrow (1995), 103 Ohio App.3d 368, 370-371, 659 N.E.2d 814.   In the case sub judice, we do not agree with appellant's assertion.

**{¶ 56}** J.D. testified that while on those two trips, appellant engaged him in anal intercourse.   The appellee also adduced considerable evidence to show that appellant had sex with children, and possessed child pornography, at his Washington County home.   While this other evidence does not necessarily concern what occurred in Morrow County or Honduras, it does bolster the appellee's theory that appellant is attracted to young boys.   This, in turn, supports the charge that appellant took J.D. on those trips with the intention of engaging in sexual activity.

**{¶ 57}** For example, A.B. testified that he awoke one night with appellant in bed next to him, and Vaseline smeared on his buttocks.   G.L. recounted a similar incident although he stated that appellant was "humping" him between the legs.   Several videos featuring these boys were found at appellant's premises, including a video that appellant filmed of A.B. in the bathroom to which appellant admitted that he regretted filming. Numerous pornographic pictures of young boys were found on his computer, as well as "cookies" or temporary links to pornographic websites (including one site in Russia that contains pictures of underage boys).

{¶ 58} We, however, recognize that appellant adduced substantial evidence at trial to support his view of the facts. He denied all accusations against him, save for making the A.B. video, and stressed that he is interested in adult women rather than young boys. Appellant singled out a neighbor, Nancy Harris, as someone to whom he felt romantic attraction.[15] Another neighbor, Angie Scott, testified that her son was close to appellant and she had no concern about him spending time at appellant's home. Also, many men[16] and children testified about spending time at appellant's home and that appellant did not act inappropriately toward them, nor had they seen other children behave inappropriately. As noted earlier, D.H. testified that police coerced him into accusing appellant of engaging him sexual conduct. D.H.'s father, D.L., explicitly stated that he did not believe that appellant engaged in any of the reported activities.

{¶ 59} This is but a small sampling of the evidence that both sides presented over several weeks and contained in a trial transcript that exceeds 3,000 pages. In essence, what this case comes down to, as cases often do, is which side the jury found to be more credible.

{¶ 60} The trier of fact has the duty to determine the weight and credibility of evidence. See State v. Frazier, 115 Ohio St.3d 139, 873 N.E.2d 1263, 2007-Ohio-5048, at ¶106; State v.

---

[15] Harris testified, however, that she and appellant had not been intimate and that he had never made a "pass" at her. Appellant explained this by saying that he felt uncomfortable doing so because she had a long term boyfriend. Harris also testified that she had never seen naked boys running around the house and that her son Troy spent time with appellant and that she had no concerns about her son continuing to spend time with him even after his arrest.

[16] Shawn Cline, who was twenty-two years old at the time of the trial, testified that he met appellant when he was twelve. He described appellant as a "father figure" and stated that appellant had never acted toward him in a sexually inappropriate manner.

Dye (1998), 82 Ohio St.3d 323, 329, 695 N.E.2d 763.   Here, the jury as the trier of fact was free

to believe all, part or none of the testimony of any witness who appeared before it.   State v.

Colquitt, 188 Ohio App.3d 509, 936 N.E.2d 76, 2010-Ohio-2210, at ¶10, fn. 1; State v. Nichols

(1993), 85 Ohio App.3d 65, 76, 619 N.E.2d 80.   The underlying rationale for deferring to the

trier of fact is that the trier of fact is best positioned to view the witnesses, to observe demeanor,

gestures and voice inflections and to use those observations to weigh witness credibility. See

Myers v. Garson (1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742; Seasons Coal Co. v.

Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

{¶ 61} In the case sub judice, the jury obviously found the prosecution's view of the

evidence more compelling as to the kidnapping charges.   We find nothing in the record to

persuade us to second-guess those findings.   Accordingly, we hereby overrule appellant's fifth

assignment of error.

VI

{¶ 62} In his sixth assignment of error, appellant asserts that his convictions should be

reversed and the case remanded for a new trial because he received constitutionally ineffective

assistance from his trial counsel.   Appellant cites, in particular, three instances that demonstrate

counsel's sub-par performance.   We, however, find no merit to appellant's claims.

{¶ 63} A criminal defendant has a constitutional right to the effective assistance from

counsel.   McMann v. Richardson (1970), 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763;

State v. Lytle (Mar. 10, 1997), Ross App. No. 96CA2182. To establish ineffective assistance of

counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) such

deficient performance prejudiced the defense and deprived him of a fair trial. See e.g. Strickland

v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; also see State v.

Perez, 124 Ohio St.3d 122, 920 N.E.2d 104, 2009-Ohio-6179, at ¶200.   However, both prongs of

the "Strickland test" need not be analyzed if a claim can be resolved under one. State v. Madrigal

(2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52.

{¶ 64} To establish the existence of prejudice, a defendant must show that a reasonable

probability exists that but for counsel's alleged error, the result of the trial would have been

different. State v. White (1998), 82 Ohio St.3d 16, 23, 693 N.E.2d 772; State v. Bradley (1989),

42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus.

{¶ 65} Appellant first argues that his counsel should have sought to sever "all counts

related to the video of [A.B.]."   Due to the disturbing nature of the video, appellant continues,

"the jury was likely to convict [him] on the other counts solely based on what it saw in the

video."

{¶ 66} We agree about the disturbing nature of the video.   A.B., twelve years old at the

time, displayed his genitalia in a provocative manner and asked appellant if he was "horny."

Later,   A.B. is apparently seen on the toilet defecating.[17]   After our review of the entire record,

however, it is difficult to conceive that the outcome of trial would have been otherwise had this

count been severed from the other counts.   Even without this video, the fact remains that an

abundance of incriminating testimony, together with other disturbing videos and pornographic

---

[17]   Appellant sought to justify the video by saying A.B. had just seen "Jackass: The Movie" and wanted to imitate some of the scenes from that movie.   Scenes from the actual movie were even played to the jury to illustrate the sort of tasteless activities appellant claims A.B. wanted to film and imitate.   Appellant conceded, however, that an adult in his late thirties (the video was apparently filmed five years prior to trial) should have exhibited better judgment concerning the boundaries of appropriate behavior than a twelve year old boy.

images found in appellant's home, was introduced into evidence at trial.

**{¶ 67}** Moreover, appellate courts will not review, for purposes of ineffective assistance claims, trial "strategy," even if that trial strategy proves to be ultimately unsuccessful. State v. Maughmer, Ross App. No. 09CA3121, 2010-Ohio-4425, at ¶6; State v. Campbell, Athens App. No. 08CA31, 2009-Ohio-4992, at ¶13; State v. Sudderth, Lawrence App. No. 07CA38, 2008-Ohio-5115, at ¶24. The A.B. video is the only offense to which appellant admitted culpability. Counsel may well have employed a strategy that voluntarily admitting to one offense may persuade the jury that he was truthful in his denial of the other alleged offenses.

**{¶ 68}** Appellant's second alleged instance of ineffective assistance is trial counsel's failure "to retain additional expert witnesses" who could testify it was "not possible" for a middle aged man to engage in anal sex with pre-teen boys without any of the alleged victims "suffering any pain, bleeding, trauma, or any physical side effects." Appellant, however, has not presented anything to persuade us that such acts could not have occurred without those consequences. It appears that harm and discomfort from sexual activity would depend on various factors and would not necessarily result in all circumstances. We find no such evidence in the record in this area. Records from a local grocery store do reveal that appellant purchased nineteen (19) jars of Vaseline petroleum jelly in the twenty-six (26) months prior to his arrest. Several victims testified that they found Vaseline on their buttocks area after having spent the night at appellant's home. In the absence of some expert evidence to show "pain, bleeding, trauma" or other physical side effects would have necessarily occurred, we cannot conclude that appellant suffered prejudice. This Court will not generally presume the requisite prejudice necessary to meet the Strickland standard. Prejudice must be affirmatively shown. See e.g. State v. Miller, Lawrence

App. No. 10CA2, 2010- Ohio-3710, at ¶11; State v. Hairston, Scioto App. No. 06CA3089, 2007-Ohio-3707, at ¶ 16; State v. Tucker (Apr. 2, 2002), Ross App. No. 01 CA2592.   In the case at bar, appellant has not demonstrated prejudice and, we cannot conclude that he received constitutionally ineffective assistance from counsel.

{¶ 69} Appellant's third claim of ineffective assistance is the failure to object to the imposition of consecutive sentences without the court making "necessary statutory findings" to do so.   This argument, essentially, parallels the argument he made in his second assignment of error.   As we noted then, the authority appellant cites for that proposition does not support his argument.   A counsel's failure to engage in vain acts does not support a claim of ineffective representation. State v. Moore, Stark App. Nos. 2004CA00266, 2004CA00295, 2005-Ohio-2849, at ¶23; State v. Caldwell, Cuyahoga App. No. 80556, 2002-Ohio-4911, at ¶37.   For all of these reasons, we find no merit to appellant's sixth assignment of error and it is hereby overruled.[18]

{¶ 70} Having reviewed all errors that appellant assigned and argued in his brief, and having found merit in none, we hereby affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs

---

[18] As an aside, we actually commend trial counsel for some particularly skilled representation during the course of the    trial, especially the cross-examination of witnesses.    For instance, Kristen Slaper gave very incriminating evidence when she testified about appellant's DNA appearing in the same place as some of the DNA of the victims.    In bedding cutting "8.8" for example, the witness placed one of appellant's sperm cells on the same location as J.D.'s non-sperm cell, thus bolstering J.D.'s claim he was anally raped by appellant.    After thorough cross-examination, however, Slaper conceded that she could not determine how long either cell had been there or which was deposited first on the bedding.    In other words, J.D. may well have slept on the bedding some time before or after appellant may have masturbated on the bedding.    This raises an issue for the jury's consideration about the value of the DNA evidence.

herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, P.J. & Kline, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.